***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 *********** RULING ON EVIDENTIARY MATTER
Plaintiff made a motion to admit additional evidence into the record before the Full Commission. Defendants did not respond. The Full Commission herein denies Plaintiff's motion.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer/employee relationship existed on the date of the alleged accident.
3. The record consists of Stipulated Exhibits 1-6, Plaintiff's Exhibit 1-2 (post hearing correspondence and attachments), transcripts of the depositions of Ms. Alexander, Dr. Katz and Dr. Powell, and questions submitted to Dr. Pedraza and his responses to said questions.
4. Issues for resolution are as follows:
 A. Whether Plaintiff sustained additional injuries in the accident of February 1, 2008;
 B. Whether Plaintiff is entitled to additional temporary total disability benefits; and
 C. Whether Plaintiff is entitled to additional benefits.
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 51 years old, having a date of birth of August 3, 1959. Plaintiff is a high school graduate and completed some college coursework in nursing. Her work experience prior to working for Defendant-Employer includes production work in factory settings, providing home health care, and work as a developmental technician. *Page 3 
2. Plaintiff worked as a paraprofessional technician for Defendant-Employer. In that role, Plaintiff was responsible for supervising and counseling emotionally and behaviorally disabled children and teenagers, cleaning, and performing documentation.
3. On February 1, 2008, Plaintiff sustained injuries to her right knee and right ankle when she was attempting to restrain an aggressive client, and the client fell on her right leg. Following the incident, Plaintiff contacted her supervisor who instructed Plaintiff to write a report and to seek medical treatment the following morning.
4. Defendants accepted responsibility for a right knee and right foot injury by filing a Form 60 dated October 10, 2008.
5. On February 2, 2008, Plaintiff treated at Physician's Prime Care Centre for complaints of a twist and pain in the right knee and right ankle. Plaintiff was released the same day with sedentary work restrictions.
6. Thereafter, Defendant-Employer accommodated Plaintiff's light duty restrictions, and Plaintiff continued to earn the same wages as she had prior to the incident.
7. On February 14, 2008, Plaintiff began treating at Orthopaedics East in Greenville, North Carolina with Dr. Josiah Duke. Plaintiff's chief complaint to Dr. Duke was right knee pain, however, she also complained of weakness and pain in the right knee and pain in her lateral right ankle. Dr. Duke diagnosed Plaintiff with ankle sprain and a right medial collateral ligament (MCL) sprain, and he identified some anterior cruciate ligament (ACL) laxity. Dr. Duke recommended range of motion strengthening for Plaintiff's ankle, as well as the use of an air splint. He also noted that Plaintiff needed an MRI for her right knee.
8. On February 19, 2008, Plaintiff underwent an MRI examination of her right knee. The MRI revealed a Grade III proximal MCL tear, a moderate partial proximate ACL sprain, a *Page 4 
small free edge tear of the posterior horn of the medial meniscus, bone contusions of the lateral femoral condyle, lateral tibial plateau and fibular head, and advanced patellofemoral osteoarthritis and minimal femorotibial osteoarthritis.
9. Plaintiff began physical therapy on March 13, 2008 at the recommendation of Dr. Duke. A weekly patient progress summary dated March 25, 2008 indicates that Plaintiff gave less than full effort during her physical therapy session.
10. A March 28, 2008 record indicates that Plaintiff required verbal cuing to repeat exercises and that she continued to put forth slow and low effort.
11. An April 4, 2008 physical therapy record indicates that Plaintiff continued to perform her exercises slowly.
12. On April 18, 2008, Plaintiff ambulated to and from her physical therapy session with crutches, an ankle brace and a knee brace. However, Plaintiff ambulated with no crutches, no ankle brace and no knee brace while at the clinic.
13. On April 28, 2008, Plaintiff continued to use crutches at her therapy appointment, despite having been cleared to ambulate without them. Plaintiff's Weekly Patient Progress Summary from that date also indicates that Plaintiff was not complying with her home exercise program.
14. On May 2, 2008, the physical therapist indicated that Plaintiff's therapy was placed on hold pending follow up with the doctor due to inconsistent findings.
15. On May 7, 2008, Plaintiff continued to complain to Dr. Duke of medial knee pain and lateral ankle pain. Plaintiff also complained that her therapist was pushing her too hard. Despite this, Dr. Duke noted that Plaintiff seemed to be doing fairly well.
16. On May 19, 2008, Plaintiff once again insisted on using crutches despite the fact *Page 5 
that there were no significant findings involving her knee other than her pain complaints.
17. On May 27, 2008, the physical therapist noted that Plaintiff, presents with symptoms more significant than reported injury and this level of healing duration." He also noted that Plaintiff failed to demonstrate compliance with her home exercise program, and that Plaintiff was self-limiting due to pain.
18. After a conflict arose between Plaintiff and a co-worker, Defendant-Employer moved Plaintiff to its administrative office where Plaintiff worked first shredding documents, and then as a receptionist. In that position, Plaintiff answered telephones and organized documents and was not required to be on her feet.
19. Beginning around August 2008, Plaintiff failed on several occasions to provide Defendant-Employer with information about the dates of her medical appointments as required by Defendant-Employer's policies. Plaintiff also began to behave in a manner which Defendant-Employer's personnel manager, Agnes Randolph, considered belligerent and ugly. Throughout this, Defendant-Employer continued to accommodate Plaintiff's light duty restrictions.
20. On June 2, 2008, Plaintiff returned to Dr. Duke with continued complaints of pain in the front and posterior aspect of her right knee, right ankle pain and some radicular pain and symptoms. Plaintiff also complained of occasional pain radiating from her posterior calf down into her anterior ankle and across the front of her ankle, and occasional pain in the top of her foot associated with a burning sensation.
21. Plaintiff continued to complain of knee problems to Dr. Duke on June 27, 2008. Plaintiff was written a prescription for a walking cane. At physical therapy, Plaintiff continued to use a crutch despite her physical therapist's requests that she discontinue its use.
22. On July 15, 2008, Plaintiff began treating at Goldsboro Orthopaedic Associates *Page 6 
with Dr. Hector Pedraza. Plaintiff's chief complaint to Dr. Pedraza was right knee pain.
23. After reviewing the February 19, 2008 MRI of Plaintiff's knee, Dr. Pedraza was unable to determine with any degree of medical certainty whether Plaintiff had a complete ACL tear. He did, however, indicate that she appeared to have a partial tear of some of the fibers and a small posterior horn tear of the medial meniscus. Dr. Pedraza opined that the majority of Plaintiff's symptoms were related to her patellar abnormality as well as weakness of the quadriceps muscles secondary to her prolonged pain. He noted that her clinical examination did not show significant instability, and he felt that the partial thickness ACL abnormality played very little role in her symptoms.
24. Dr. Pedraza recommended arthroscopy to further evaluate Plaintiff's knee joint, at which time the meniscal abnormality could be addressed. Dr. Pedraza recommended that Plaintiff be placed on a vigorous physical therapy regimen following the arthroscopy, and opined that she would be at maximum medical improvement 60 to 90 days later.
25. On September 3, 2008, Plaintiff reported to Dr. Pedraza's office to prepare for knee surgery. At the appointment, Plaintiff alleged that she was experiencing back pain resulting from her work injury. Plaintiff also complained of thumb pain and left knee pain, which she alleged began in late June, 2008. Dr. Pedraza elected to delay Plaintiff's knee surgery until her back complaints were evaluated.
26. On September 15, 2008, Plaintiff treated at Goldsboro Neurological Surgery with Dr. Barry Katz. The physical examination revealed no pain upon palpation of the back and moderate range of motion. With the exception of a mild decrease in sensation in the right anterior thigh, Plaintiff's strength and sensation were totally normal in her upper and lower extremities and she had no pathological reflexes. Dr. Katz opined that there was questionable *Page 7 
right lower extremity radiculopathy and that an MRI examination should be performed.
27. On September 25, 2008, Plaintiff underwent an MRI examination of the lumbar spine which revealed a central disc protrusion at L5-S1 with mild effacement involving the right S1 root. No canal or foraminal stenosis or disc herniation was observed.
28. On October 9, 2008, Dr. Katz reviewed the MRI and indicated that it showed a small disc protrusion at L5-S1. While Dr. Katz believed the disc protrusion could be contributing to some of Plaintiff's symptoms, he was unsure of what was causing the bulk of her symptoms. Dr. Katz recommended trying conservative treatment before pursuing surgery. Dr. Katz noted that Plaintiff was reluctant to try any treatment including steroid injections.
29. On October 21, 2008, Plaintiff returned to Dr. Pedraza with continued complaints of ankle and knee pain. Plaintiff had numerous questions for Dr. Pedraza about the epidural steroid injection treatment Dr. Katz had recommended, and Dr. Pedraza encouraged Plaintiff to consider proceeding with the injections. Dr. Pedraza indicated that he had no documentation to verify any kind of injury to her ankle, and that, prior to proceeding with surgery on her knee, he wanted her back problem to be corrected, or at least made tolerable.
30. On November 19, 2008, Plaintiff refused to speak with the medical case manager assigned to her. The medical case manager also indicated that Plaintiff was reluctant to follow through with recommendations made by her physicians and that she continued to use a crutch rather than a cane for ambulation.
31. On December 3, 2008, Plaintiff returned to Dr. Katz. He discussed further conservative treatment for Plaintiff's back, and indicated that he would not recommend surgery. Plaintiff indicated that she did not want steroid injections. Dr. Katz gave Plaintiff a 0% permanent partial disability rating to the back and indicated that, if conservative treatment did *Page 8 
not help her over the next two months, a functional capacity evaluation (FCE) could be obtained for determining work restrictions.
32. On January 16, 2009, Defendants filed a motion to compel Plaintiff's compliance with medical treatment. Executive Secretary Tracey H. Weaver approved Defendants' motion in an Order filed February 23, 2009.
33. On April 24, 2009, Plaintiff underwent an FCE. The FCE report indicates that Plaintiff self-limited on 50% of the tasks undertaken in the functional capacity evaluation. According to the report, self-limiting behavior exceeding 20% indicates that psychosocial and/or motivational factors are affecting testing results. Plaintiff testified that she did her best on the FCE.
34. On May 29, 2009, Defendants filed a Form 61 specifically denying responsibility for an allegedly compensable back injury. Defendants did, however, agree to pay for and provide medical treatment for Plaintiff's back condition in light of Dr. Pedraza's contention that he could not treat the compensable knee injury until Plaintiff's back complaints were addressed.
35. As reported in a June 2, 2009 medical case manager report, on June 1, 2009, the medical case manager asked Plaintiff about her medical condition, and Plaintiff told her that it was not any of her business and refused to discuss the subject. As a result, the medical case manager informed Plaintiff that she could no longer work on her case because Plaintiff was argumentative and uncooperative, and she requested that a different medical case manager be assigned to the claim.
36. On July 14, 2009, Plaintiff underwent a right knee arthroscopy performed by Dr. Pedraza.
37. In July of 2009, Plaintiff sought unauthorized treatment with Dr. Keith Tucci at *Page 9 
East Carolina University. Plaintiff underwent a myelogram and postmyelogram CT scan of her back. On July 23, 2009, Dr. Tucci opined that Plaintiff's back condition did not necessitate neurosurgical intervention. This was the same opinion given by Dr. Katz.
38. During Plaintiff's absence from work related to her right knee surgery in the summer of 2009, Plaintiff was placed on medical leave in keeping with Defendant-Employer's policies. Plaintiff was supposed to return to work on July 28, 2009 but failed to do so.
39. On July 28, 2009, Plaintiff's first attorney filed an N.C.I.C. Form 33 Request that Claim be Assigned for Hearing, alleging that Defendants had failed and refused to provide all benefits to which Plaintiff was entitled. On the section of the Form labeled, "Part of body", Plaintiff's attorney indicated, "right knee, right ankle back and otherwise injured."
40. On August 3, 2009, Defendants filed an N.C.I.C. Form 33R Response to Request that Claim be Assigned for Hearing contending that Defendants had provided all benefits to which Plaintiff was entitled under the Act, and stating that they had encountered difficulty providing those benefits to Plaintiff.
41. On August 5, 2009, Defendant-Employer sent Plaintiff a letter indicating that she had failed to communicate with Defendant-Employer regarding her return to work, explaining that she was not in compliance with Defendant-Employer's policy, and notifying her that it was imperative that she supply Defendant-Employer with written documentation of her medical status by August 10, 2009.
42. Plaintiff returned to work on August 11, 2009. An N.C.I.C. Form 28T Notice of Termination of Compensation by Reason of Trial Return to Work was filed by Defendants the same day. Plaintiff worked from 8:00 a.m. until 12:00 p.m. on August 11, 2009 and then began complaining about pain. Plaintiff asserted that her left knee had gone out and she left work. *Page 10 
43. Plaintiff telephoned Defendant-Employer one or two days later, at which point Ms. Randolph requested that she report to the office to complete some paperwork. When Plaintiff reported to the office that afternoon, Ms. Randolph issued her a reprimand and probationary forms due to her failure to provide medical documentation. In response, Plaintiff became angry and refused to sign the reprimand, despite being told that her signature was simply an acknowledgement of receipt of the reprimand, and that she could avail herself of Defendant-Employer's grievance policy if she did not agree with the contents of the reprimand. After Plaintiff proceeded to yell at Ms. Randolph, Ms. Randolph asked Plaintiff to leave her office. Before Plaintiff left, Ms. Randolph informed Plaintiff that she would receive an additional reprimand for refusing to sign the first reprimand, and that the additional reprimand would lead to her termination.
44. Ms. Randolph testified that Plaintiff was terminated for failure to comply with Defendant-Employer's policies, and that any other employee would have been terminated for the same conduct whether or not that employee had been injured. This testimony by Ms. Randolph is deemed credible by the Full Commission.
45. On August 13, 2009, Defendants filed an N.C.I.C. Form 61 Denial of Workers' Compensation Claim specifically denying an alleged left leg injury.
46. On August 14, 2009, Plaintiff was officially terminated by Defendant-Employer.
47. The Full Commission finds that Plaintiff's conduct which led to her termination constitutes an unjustified refusal of suitable employment, and, as such, Plaintiff is not entitled to temporary total disability benefits during the period of time between her termination and September 8, 2009 when Dr. Pedraza wrote Plaintiff out of work.
48. An MRI of Plaintiff's right ankle taken on August 17, 2009 was essentially *Page 11 
normal.
49. On September 8, 2009, Dr. Pedraza wrote Plaintiff completely out of work until her next appointment and ordered aggressive physical therapy, use of knee and ankle braces, and use of a walker as opposed to a cane. Defendants reinstated payment of temporary total disability benefits to Plaintiff and filed an N.C.I.C. Form 62 as of September 8, 2009.
50. In correspondence dated October 5, 2009, Dr. Pedraza informed Plaintiff that he had been notified by Plaintiff's physical therapy provider of her failure to actively participate in therapy. Dr. Pedraza informed Plaintiff that he felt he had nothing further to offer her in the way of treatment unless she was willing to aggressively participate with physical therapy, and indicated that she would be released from his care unless her approach to physical therapy changed.
51. On October 12, 2009, Dr. Pedraza released Plaintiff from his care, declared her at maximum medical improvement, and released her to return to work. A note written by Dr. Pedraza on that date indicates that the physical therapist told Dr. Pedraza that Plaintiff was non-cooperative and that Plaintiff had refused to take Voltaren because, as she told Dr. Pedraza, it was "against her." Dr. Pedraza also confirmed that Plaintiff's right ankle MRI was normal.
52. Following his examination of Plaintiff, Dr. Pedraza invited the nurse case manager and Plaintiff back to speak with him. Plaintiff refused this offer, however. Plaintiff left the appointment and still refused to speak to the nurse case manager or to let the nurse case manager speak to Dr. Pedraza while she was present. Furthermore, when the nurse case manager met Plaintiff while entering the waiting area at Dr. Pedraza's office on October 12, 2009, Plaintiff declined to acknowledge the case manager or verify that she was in fact the injured worker. *Page 12 
53. On December 3, 2009, Defendants filed an N.C.I.C Form 24 Application to Terminate or Suspend Payment of Compensation, contending that Plaintiff had received all medical treatment to which she was entitled and had been released by her treating physician to return to regular duty work following her admittedly compensable right ankle and right knee injuries. Defendants further contended that Plaintiff was previously terminated for causes totally unrelated to her compensable and allegedly compensable work-related injuries and would be able to return to work otherwise.
54. On December 11, 2009, Plaintiff's first attorney moved to withdraw as counsel. On January 6, 2010, then Executive Secretary Weaver granted that request. Plaintiff subsequently obtained the services of a second attorney.
55. On January 12, 2010, Plaintiff sought treatment which Defendants did not authorize with Dr. Eddie Powell at Orthopaedics East for bilateral knee pain and back pain. Dr. Powell performed a physical examination of Plaintiff and reviewed x-rays. Dr. Powell recommended an MRI examination of Plaintiff's knees as well as an MRI examination of the lumbar spine. He informed Plaintiff that he might recommend anti-inflammatory treatment, physical therapy and lumbar epidural steroid injections. Dr. Powell opined, "I see no reason why she cannot do any work as far as physically or functionally."
56. On January 21, 2010, Plaintiff returned to Dr. Powell following her MRI. Dr. Powell opined that the MRI of the left knee indicated some patellofemoral changes but no meniscal tear or any internal derangement other than moderate arthritis. Dr. Powell told Plaintiff that treatment for the arthritis of the left knee would involve anti-inflammatories and physical therapy. Plaintiff was not interested in any of the treatment options Dr. Powell offered for her left knee on that day. *Page 13 
57. Dr. Powell did not form an opinion on the cause of Plaintiff's back problems.
58. With respect to Plaintiff's left knee, Dr. Powell opined that Plaintiff had some arthritic changes in the knee. He further opined that, while Plaintiff's left knee pain could be indirectly caused by her work injury in that she had to assume more function with her left knee as the result of her work related right knee condition, there was no direct causal connection between Plaintiff's work injury and her left knee condition.
59. On January 28, 2010, Special Deputy Commissioner Christopher B. Rawls entered an administrative order stating "the Industrial Commission is unable to reach a decision on the Form 24 Application following an informal hearing."
60. On January 29, 2010, Plaintiff's second attorney filed a motion to withdraw as counsel stating that he had experienced "irreconcilable differences regarding the further handling of Plaintiff's claim." That motion was granted in an order by Deputy Commissioner DeLuca filed February 5, 2010.
61. Deputy Commissioner DeLuca offered Plaintiff time to obtain another attorney, however, Plaintiff wanted to move forward with the hearing in New Bern.
62. Also on January 29, 2010, Defendants filed a Form 33 Request for Hearing appealing Special Deputy Commissioner Rawls' administrative order and requesting that the issues raised in the Form 24 Application be heard before the Deputy Commissioner.
63. Plaintiff's compensation rate is $316.87. Plaintiff has received all temporary total disability benefits to which she is entitled to date, including reimbursement for underpayment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following: *Page 14 
 CONCLUSIONS OF LAW
1. Plaintiff sustained admittedly compensable injuries by accident to her right knee and right ankle on February 1, 2008. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to have Defendants pay for all medical expenses reasonably related to her compensable right knee and right ankle injuries that were incurred to lessen the period of disability, effect a cure, or give relief. N.C. Gen. Stat. § 97-25.
3. Plaintiff's temporary total disability benefits shall be terminated as of December 3, 2009, the day when Defendants filed their Form 24 application, as there is no presumption of ongoing disability, Plaintiff has been released to return to work with no restrictions at maximum medical improvement and is no longer disabled. Effingham v. Kroger Co.,149 N.C. App. 105, 112, 561 S.E.2d 287, 292 (2002); Sims v.Charmes/Arby's Roast Beef,142 N.C. App. 154, 160, 542 S.E.2d 277, 282, disc. reviewdenied, 353 N.C. 729, 550 S.E.2d 782 (2001); Russell v. LowesProducts Distributing,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993);Harrington v. Adams-Robinson Enter.,349 N.C. 218, 504 S.E.2d 786 (1998).
4. Plaintiff is not entitled to any temporary total disability benefits during the period of time between her termination and Dr. Pedraza's September 8, 2009 note taking Plaintiff out of work completely due to her constructive refusal of suitable employment.Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 397 (1996).
5. Plaintiff has received all temporary total disability benefits to which she is entitled to date, including reimbursement for underpayment. N.C. Gen. Stat. § 97-29.
6. Plaintiff has reached maximum medical improvement for her compensable right knee and right ankle injuries. As such, Plaintiff is entitled to payment by defendant for her permanent partial disability rating to the right leg and foot, if one is given. N.C. Gen. Stat. § 97-31(15). *Page 15 
7. Defendants are entitled to a credit pursuant to N.C. Gen. Stat. § 97-42 and North Carolina Industrial Commission Rule 404(8) for temporary total disability benefits paid to Plaintiff after December 3, 2009.
8. No causal connection has been established between Plaintiff's employment and her alleged back and left leg injuries, and these claims must be denied. Bolling v. Belk-White Co.,228 N.C. 749, 46 S.E.2d 838 (1948).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Defendant shall pay Plaintiff's rating for her compensable right knee and right ankle injuries, if any is given.
2. Defendants are entitled to a credit for all temporary total disability benefits paid to Plaintiff after December 3, 2009.
3. Defendants shall pay for medical expenses incurred or to be incurred by Plaintiff as a result of her compensable right knee and right ankle injuries.
4. Plaintiff's claim for benefits for her alleged back and left leg injuries is hereby DENIED.
5. The parties shall pay their own costs.
This the __ day of June 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1